UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jill Mari Embry,

Plaintiff,

vs.

Deltec, Inc., et al.,

Defendants.

Civil No. 01-2426 JMR/FLN

**REPORT AND RECOMMENDATION**

---

Marcy Wallace, Esq., for Plaintiff.
Jonathan Parritz, Esq., for Defendants.

---

**THIS MATTER** came for a hearing before the undersigned United States Magistrate Judge on April 12, 2002, on Defendants Deltec, Inc., et al.'s ("Defendants") Motion to Dismiss: (1) Counts I (Race and Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964 ("Title VII")) and II (Race and Sex Discrimination in Violation of Minnesota Human Rights Act ("MHRA")) against the individually named Defendants because there is no cause of action under Title VII or the MHRA against said Defendants; (2) Count IV (Misappropriation of Trade Secrets); (3) Count VI (Tortious Interference with Contract); and (4) Count VII (Defamation) of the Complaint pursuant to Fed. R. Civ. P. 12(b)(6).[1] This matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636. For the reasons which follow, this Court

---

[1] Initially, Defendants also sought dismissal of Count IV (Breach of Contract) because the Complaint did not allege a material breach of a contract by Defendant Deltec. On February 14, 2002, Plaintiff properly filed a First Amended Complaint in an effort to resolve any alleged technical deficiencies in her original Complaint. During the April 12, 2002, Hearing, Defendants withdrew their Motion to Dismiss Count IV (Breach of Contract).

JUN 7 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

will recommend that Defendants' motion be granted in part and denied in part.

## I. FACTUAL BACKGROUND

Defendant Deltec, Inc., is a Minnesota corporation that is engaged in the business of designing, developing, manufacturing and marketing medical devices. The individual Defendants, Mr. Rhall Pope, Ms. Betty Potasnak and Ms. Nancy Reichow, are all member of Deltec's management team. Plaintiff Jill Mari Embry ("Plaintiff") was hired by Deltec in November of 1999, as an Engineer/Scientist II in Deltec's Research and Development Department. This action arises from the alleged breach of contract, misappropriation of trade secrets, tortious interference with contract, discriminatory conduct and overbroad covenant not to compete inflicted on Plaintiff by Defendants. In considering Defendants' motions, the facts are recounted (as they must be) from a fair reading of Plaintiff's version of the evidence. See Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Ring v. First Interstate Mfg., Inc., 984 F.2d 924 (8th Cir. 1993); Klett v. Pim, 965 F.2d 587, 589 (8th Cir. 1992); U.S. v. Aceto Agric. Chem. Corp., 872 F.2d 1373, 1376 (8th Cir. 1989); Toombs v. Bell, 798 F.2d 297, 298 (8th Cir. 1986).

On November 22, 1999, Plaintiff was hired by Defendant Deltec as an Engineer/Scientist II in Deltec's Research and Development Department. (See First Am. Compl. at ¶ 9.) At or about the same time Plaintiff and Defendant Deltec entered into a written "Employee Created Works, Confidentiality and Noncompetition Agreement." (First Am. Compl. at ¶ 10.) Defendant Deltec's boilerplate form agreement generally provided that inventions and other types of intellectual property created by an employee during her employment were to be owned by Defendant Deltec. (Id.) Plaintiff, previously being employed in the medical device industry, had various ideas for potential developments that she desired to protect and was unwilling to grant such a broad right to

her future inventions to Defendant Deltec. (Id.) After negotiations, the final signed agreement contained four areas of potential inventions and intellectual property that would be exempt from the provisions of the agreement granting ownership rights to Defendant Deltec. (Id., Exhibit B ) The agreement also contained a clause restricting Plaintiff's right for one year after the termination of her employment, whether voluntary, or involuntary to work for a competitor. (First Am. Compl. at ¶ 11.) The non-compete covenant had no geographical limitation of any kind and also provided for injunctive relief in the event of a breach of this clause and recited that Defendant Deltec would be entitled to recover attorney fees in addition to damages. (Id.)

Because Plaintiff's position was newly created, the aforementioned employment agreement provided that her written job description would be reviewed within six months to determine whether it was adequate. (First Am. Compl. at ¶ 12.) Ms. Reichow signed the agreement for Defendant Deltec. (Id. at ¶ 13.) Plaintiff does not know who made the decision to hire her, but believes that the decision was made against the wishes of her then direct supervisor Roger Christopherson, Process Development Manager in Defendant Deltec's Research and Development Department. (Id.) Mr. Christopherson reported directly to Mr. Pope, Vice-President of Research and Development (Id.)

At the time, Plaintiff was the only person of color in Deltec's Research and Development Department. (Id. at ¶ 14.) The Research and Development Department had no senior-level female employee reporting directly to Mr. Pope, and except for the brief period of time alleged herein when Plaintiff and one other female employee reported directly to Mr. Pope, this remained true throughout the term of her employment. (Id.)

In the spring of 2000, Plaintiff, with the knowledge and support of her supervisors, became

involved in a project known within the company as "Regionals" or "Regional Chemotherapy." (First Am. Compl. ¶ 15.) The project fit within two of the four exceptions to Defendant Deltec's ownership rights set forth in Plaintiff's aforementioned Employee Created Works, Confidentiality and Noncompetition Agreement.[2] (First Am. Compl. at ¶ 16.)

On June 29, 2000, Plaintiff met with Mr. Christopherson for an early performance review. (Id. at ¶ 17.) Plaintiff's review was above average, except for the category of "flexibility" where she was rated average. (Id.) Mr. Christopherson explained that she was seen as arrogant with regard to her knowledge and told her, "Jill, no one likes someone who is right all of the time. You sometimes need to dummy down and pick things to be wrong about." (Id.) Plaintiff submitted a letter to her personnel file protesting this comment. (Id.) On July 10, 2000, Plaintiff submitted a letter of resignation to Defendant Deltec in order to take another professional position that she had been offered. (First Am. Compl. at ¶ 18.) Thereafter, Mr. Pope and Ms. Reichow, H.R. Generalist, assuaged Plaintiff's concerns and urged her to remain with Defendant Deltec. (Id.) Mr. Pope and Ms. Reichow promised that Plaintiff would be promoted upon completion of the first draft of her Master's Thesis and that upon her promotion she would report directly to Mr. Pope. (Id.) As a result of these re-assurances, Plaintiff withdrew her letter of resignation and turned down the other position. (Id.)

On September 29, 2000, Plaintiff was given her regular annual performance review by Mr.

---

[2] "(iii) embolic agents for the treatment of vascular diseases (including these systems include various hydrogel systems and foams; degradable or non-degradable; used for treatment of such diseases as uterine fibroids, hepatocellular caracinoma, and other vascular treated tumors); and (iv) delivery systems associated with the above embolic agent (including catheter systems that would be used for embolization)."

Christopherson. (First Am. Compl. at ¶ 19.) Her contributions were rated "commendable" at that time and Mr. Pope added a complimentary note to her performance review. (Id.) On or about October 23, 2000, Mr. Christopherson resigned his employment with Defendant Deltec, and as a result, Mr. Pope became Plaintiff's direct supervisor. (Id.) Immediately after Mr. Christopherson's resignation, Mr. Pope began to criticize Plaintiff for matters not identified as problems in her recent formal performance review. (Id. at ¶ 20.) Plaintiff alleges that these criticisms were unjustified, delivered in a harsh, demeaning manner and with a raised voice. (Id.) According to Plaintiff, this course of unjustified conduct, continued throughout the term of her employment.[3] (Id. at ¶ 21.)

In December 2000, having completed the first draft of her Master's Thesis, Plaintiff was promoted to the position of Senior Engineer/Scientist (Engineer III level) in the Research and Development Division, effective January 2001. (Id. at ¶ 23.) Her salary was increased but her duties remained the same. (Id.)

On January 19, 2001, Mr. Pope, Ms. Reichow and Plaintiff met to discuss difficulties in obtaining needed resources for two of the projects she was working on. (First Am. Compl. at ¶ 24.) During this meeting, Mr. Pope harshly criticized Plaintiff's work performance, again reducing her

---

[3] For example, Plaintiff alleges that Mr. Pope would set performance objectives that were dependent upon the work and performance of others and also permitted other employees to refuse to assist Plaintiff on projects where their assistance was needed. He regularly shouted at her when discussing business matters, often reducing her to tears and would then reprimand her or send her home for crying. He also supported other employees in bringing their technical questions to Plaintiff's co-worker from the marketing department instead of Plaintff and would do the same thing himself. He constantly attacked her manner of communicating with her co-workers and claimed that she was unable to get along with others. Mr. Pope did not treat similarly situated white male employees in this fashion. For example, he harshly criticized Plaintiff for certain documents she submitted to him but did not criticize the white male co-author of those documents. (First Am. Compl. ¶ 21-22.)

to tears. (Id.) He criticized her for failing to follow standard documentation formats in providing information to him despite the fact that: (1) she had used a project plan format he had provided her; (2) he had previously told her and a co-worker it was what he wanted; and (3) draft format revisions suggested by another employee had never been adopted as the company standard. (Id.)

On January 24, 2001, Mr. Pope prepared a lengthy memorandum purporting to summarize the January 19, 2001, meeting. (Id. at ¶ 25.) It harshly criticized Plaintiff and set forth a list of behavior changes to which she had supposedly agreed. (Id.) Ms. Reichow also signed the memorandum; however, neither Mr. Pope nor Ms. Reichow ever gave it to Plaintiff and merely placed it in her personnel file. (Id.)

Two days later, on January 26, 2001, Ms. Reichow, Mr. Pope and Plaintiff met again. (First Am. Compl. at ¶ 26.) Mr. Pope presented Plaintiff with a one-page memorandum also dated January 24, 2001, which listed performance issues needing improvement. (Id.) The memorandum was far less critical than the aforementioned memorandum that was placed in her file without her knowledge and referred to Plaintiff as a "valued contributor." (Id.) Plaintiff requested and received an opportunity to respond to this memorandum. (Id.) On January 29, 2001, Plaintiff presented a memorandum responding to Mr. Pope's one-page, January 24, 2001, memorandum and asked that it also be placed in her personnel file. (First Am. Compl. at ¶ 27.) Mr. Pope and Ms. Reichow assured Plaintiff that Mr. Pope's one-page, January 24, 2001, memorandum would not be placed in her file, gave her the copy that was at the meeting, told her it was the only copy and that she could destroy it. (Id.) According to Plaintiff, this information was false as at least one additional copy remained in Defendant Deltec's records. (Id.) Plaintiff contends that despite the aforementioned assurances, the memorandum was placed in her personnel file, but her responsive memorandum was

not. (Id.) Despite these difficulties with her employer, Plaintiff continued to make progress on the Regionals project. (First Am. Compl. at ¶ 28.) On February 9, 2001, Plaintiff filled out five of Defendant Deltec's "Confidential Invention Disclosure" forms disclosing confidential information. (Id.) Employees completed the forms so that Defendant Deltec could decide whether to pursue a patent on an idea. (See Def.'s Mem. in Supp. of Mot. to Dismiss at 5 ("Def.'s Supp. Mem.").) The inventions disclosed therein were for use in regional embolization and were covered by the exclusions in the Plaintiff's Employee Created Works, Confidentiality and Noncompetition Agreement. (Id.; Ex. C.) Plaintiff also relied on the fact that the Confidential Disclosure forms promised that the data would be confidential. (First Am. Compl. at ¶ 28.)

By March 2001, Mr. Pope's conduct of shouting at her had escalated to the point where she was reluctant to meet with him alone. (First Am. Compl. at ¶ 29.) Her frequent complaints to Ms. Reichow went unsatisfied and her suggestions to improve the situation, such as mediation, having a third person present during the meetings or tape recording the meetings, were rejected. (Id.) On various occasions during the course of her employment, Plaintiff expressed to Ms. Reichow and Mr. Pope concerns that certain behavior on the part of her co-workers might be motivated by race based or gender based-animus. (First Am. Compl. at ¶ 30.) However, instead of investigating these concerns, they used this as an example of her alleged inability to get along with her co-workers. (Id.) Distressed by her employment conditions, Plaintiff sought psychological counseling, consulted the EEOC and counsel about her rights and informed Ms. Reichow that she had taken these steps. (Id. at ¶ 31.)

As of March 24, 2001, Plaintiff had never received a formal negative performance appraisal, warning or a demotion. (First Am. Compl. at ¶ 32.) On that same day, the Regionals project became

a priority project for Defendant Deltec and the project was to go forward utilizing the information Plaintiff had disclosed in February. (Id. at ¶ 33.) Immediately after a quarterly update meeting, Ms. Potasnak, Vice-President of H.R., called Plaintiff to her office and informed her that she needed to look for another job and that her employment was not working out due to communication issues. (Id. at ¶ 34-35.) Ms. Potasnak gave Plaintiff the option of either continuing her employment while looking for a new job or remaining at home to conduct said job search. (Id.)

On March 25, 2001, Plaintiff called Ms. Potasnak and asked for further clarification of the meaning of her comments at the meeting. (Id. at ¶ 36.) Later that day, Ms. Potasnak responded by a voice mail message indicating that "I am not firing you today, but we do need to work out a transition, because the way things are going, with communication the way it is, it's not working." (Id.) She went on to suggest that Plaintiff take some time off and look for a new job from her home. (Id.) Plaintiff reasonably interpreted Ms. Potasnak's comments in the meeting and in the voice mail as a termination of her employment. (Id.)

Plaintiff had been working closely with a group of independent physicians that made up a Medical Advisory Board for Defendant Deltec, and on March 25, 2001, she sent each of the members an e-mail informing them that she would no longer be working for Deltec and referred them to a co-worker for any information they might need. (First Am. Compl. at ¶ 37.) She also sent Ms. Potasnak an e-mail requesting to know, among other things, the reasons why her employment was being terminated. (Id. at ¶ 38.)

On March 28, 2001, Ms. Potasnak responded with a letter denying that Defendant Deltec was terminating Plaintiff's employment. (Id. at ¶ 39.) The letter suggested that Defendant Deltec was willing to work out a "Performance Improvement Plan" and allow Plaintiff to continue her

employment. (Id.) However, the letter also contained a Resignation Agreement and General Release. (Id.)

On April 6, 2001, Ms. Potasnak presented Plaintiff with a memorandum, dated April 5, 2001, which Mr. Pope had prepared and copied to Plaintiff's personnel file. (First Am. Compl. at ¶ 40.) Attached was a Performance Improvement Plan signed by Ms. Potasnak. (Id.) Plaintiff was also provided with a copy of Mr. Pope's lengthy January 24, 2001, memorandum that she had never seen. (Id.) According to Plaintiff, the Performance Improvement Plan was punitive and many of the alleged performance deficiencies occurred before her favorable September 2001, performance review and had not been raised as issues at that time. (Id.)

Plaintiff refused to sign the Plan as drafted. (First Am. Compl. at ¶ 43.) On April 9 and 10, 2001, she provided extensive written responses, with documentation, to the Plan and to Mr. Pope's January 24 and April 5, 2001, memoranda relating to her alleged performance deficiencies. (Id.) On April 12, 2001, Ms. Potasnak sent Plaintiff another memorandum offering her the choice of either resigning or complying with the Performance Improvement Plan as originally drafted. (First Am. Compl. at ¶ 44.) The memorandum stated that she must meet the first objective of the Performance Improvement Plan, meeting with her newly appointed supervisor, by 3:00 p.m. that day. (Id. at ¶ 44-45.) Later that day, Ms. Potasnak officially terminated Plaintiff's employment on the grounds that she had not shown up for the 3:00 p.m. appointment with the new supervisor (Id.) The letter was sent before 3:00 p.m. (Id.)

After the termination of her employment, Plaintiff personally, and through her counsel, attempted to obtain return of the original confidential disclosures from Defendant Deltec and to obtain an acknowledgment that the information belonged to her under the terms of the Employee

Created Works, Confidentiality and Noncompetition Agreement. (First Am. Compl. at ¶ 47.) Defendant Deltec, through its management, specifically Mr. Pope, Ms. Potasnak, and its counsel, refused to return the information and asserted ownership rights to the disclosures. (Id.)

Per Plaintiff, Defendant Deltec is attempting to develop and exploit her inventions for its own benefit. (Id. at ¶ 48.) Even if Defendant Deltec is not doing so, its conduct as herein alleged, has sufficiently clouded title so that Plaintiff is unable to develop and exploit the inventions herself. (Id.) Plaintiff filed the instant lawsuit on December 28, 2001, alleging claims for breach of contract, misappropriation of trade secrets, tortious interference with contract, race and sex discrimination in violation of Title VII and MHRA, and overbroad covenant not to compete.

## II. STANDARD OF REVIEW

In the case of a defendant's 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the court is limited to considering the allegations of the complaint, must take those allegations as true and must view the complaint in the light most favorable to the plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Ring v. First Interstate Mfg., Inc., 984 F.2d 924 (8th Cir. 1993); Klett v. Pim, 965 F.2d 587, 589 (8th Cir. 1992); United States v. Aceto Agric. Chem. Corp., 872 F.2d 1373, 1376 (8th Cir. 1989); Toombs v. Bell, 798 F.2d 297, 298 (8th Cir. 1986). The court should not grant a motion to dismiss merely because the complaint does not state with precision every element of the offense necessary for recovery. See 5 Wright & Miller, Federal Practice and Procedure: Civil, §§ 1216 at 120 (1969). A complaint is sufficient if it contains "allegations from which an inference can be drawn that evidence on these material points will be introduced at trial." Id. at 122-23. Moreover, a court should not dismiss a complaint unless it "appears beyond a reasonable doubt that plaintiff can prove no set of

facts in support of his complaint which would entitle him to relief." Conley, 335 U.S. at 45-46. Thus, a motion to dismiss is likely to be granted "only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." Fusco v. Xerox Corp., 676 F.2d 332, 334 (8th Cir. 1982); see also Palmer v. Tracor, Inc., 856 F.2d 1131 (8th Cir.1988); Baxley-DeLamar Monuments, Inc. v. American Cemetery Ass'n, 843 F.2d 1154 (8th Cir. 1988).

## III. CONCLUSIONS OF LAW

### A. Defendants' Motion to Dismiss Counts I & II (Race and Sex Discrimination in Violation of Title VII and MHRA)

Defendants seek to dismiss Counts I and II (Race and Sex Discrimination in Violation of MHRA and Title VII) against the individually named Defendants because there is no cause of action under Title VII or the MHRA against said Defendants.

In response to the motion, Plaintiff clarified that Counts I and II were only asserted against Defendant Deltec and were never intended to assert claims against the individually named Defendants. She also indicated that the ultimate allegations of Count I and II in the First Amended Complaint now specifically refer to Defendant Deltec only, which should eliminate any confusion.

In light of the foregoing, the Parties' representations during the hearing on this matter and in viewing the evidence in the light most favorable to Plaintiff, this Court is of the opinion that the issue is moot as it is undisputed that the individually named Defendants are not subject to individual liability under either Title VII or the MHRA. See Lenhardt v. Basic Institute of Tech., Inc., 55 F.3d 377 (8th Cir. 1995). Consequently, this Court will recommend that Defendants' Motion to Dismiss Counts I and II of the Complaint against the individually named Defendants be granted.

**B. Defendants' Motion to Dismiss Count IV (Misappropriation of Trade Secret Claim)**

Defendants seek dismissal of Count IV because the Complaint does not sufficiently allege the existence of a trade secret or plead facts sufficient to establish a claim for misappropriation of a trade secret. Specifically, Defendants argue that: (1) Plaintiff cannot allege the existence of a trade secret because she voluntarily disclosed her invention to Defendant Deltec and made no reasonable efforts to maintain its secrecy; and (2) there was no misappropriation because the information was not obtained through improper means such as theft or bribery. Additionally, Defendants contend that Count IV must be dismissed as to the aforementioned individually named Defendants because the Complaint fails to plead even one fact regarding their involvement in the alleged misappropriation.

The Uniform Trade Secrets Act, Minn. Stat. §§ 325C.01 et seq., articulates much of the common law concerning trade secrets and confidential information and allows for the protection of certain types of information through an action for misappropriation. See Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 897-98 (Minn.1983); Nordal, Inc., v. Samsco, In., 830 F.Supp. 1263 (D. Minn. 1993); Ikon Office Solution, Inc., v. Dale, 170 F. Supp.2d 892 (D Minn. 2001). The act requires that the party seeking protection must be able to demonstrate both the existence of and the misappropriation of a trade secret. See Electro-Craft Corp., 332 N.W.2d at 897.

To qualify as a trade secret under the act, information: (1) must not be generally known or readily ascertainable, (2) must derive independent economic value from secrecy, and (3) must be the subject of reasonable efforts to maintain its secrecy. See Minn. Stat. § 325C.01, subd. 5; Electro-Craft, 332 N.W.2d at 899-900; Nordale, Inc., 830 F.Supp. at 1273 (noting that the party asserting misappropriation must establish each factor to sustain its claim). Although absolute secrecy is not required, the confidential measures must be "reasonable under the circumstances."

LaserMaster Corp., v. Sentinel Imaging, 931 F. Supp. 628 (D. Minn 1996); Northwest Airlines v. American Airlines, 853 F.Supp. 1110, 1115 (D. Minn.1994) (citing Electro-Craft Corp. supra)). If, under all the circumstances, the party knows or has reason to know that the owner intends or expects the information to be secret, confidentiality measures are sufficient. See Northwest Airlines, 853 F.Supp. at 1115. A trade secret does not lose its character by being confidentially disclosed to agents, without whose assistance it could not be made of any value. See Surgidev Corp., v. Eye Tech., Inc., 648 F.Supp. 661, n. 15 (D. Minn. 1986).

Here, the pleadings clearly indicate that Plaintiff disclosed the confidential information so that Defendant Deltec could decide whether to pursue a patent on her ideas. Consequently, Plaintiff's confidential disclosure to Defendant Deltec does not preclude trade secret status since the information was confidentially disclosed to Defendant Deltec's agents, without whose assistance it could not be made of any value. Furthermore, the First Amended Complaint alleges that: (1) the Parties negotiated the "Employee Created Works, Confidentiality and Noncompetition Agreement." that exempted the information that is the subject of this motion from the provisions of the agreement granting ownership rights to Defendant Deltec; (2) said agreement addressed in detail that the information is to remain confidential; (3) Plaintiff disclosed the information on Defendant Deltec's "Confidential Invention Disclosure" forms that promised that the data would be confidential; and (4) the information was protected from outsiders so that the Company could decide whether to pursue a patent on a disclosed idea. Taken together, these allegations if true, establish that the information was the subject of reasonable efforts to maintain its secrecy and that Defendant Deltec knew or had reason to know that Plaintiff intended or expected the information to be secret. Consequently, this Court concludes that the information at issue is within the definition of a trade

secret and now turn to the question of whether the First Amended Complaint sufficiently alleges that the trade secret was misappropriated.

Misappropriation involves the use or acquisition by improper means of another's trade secret, without that person's express or implied consent, by an individual who knew or had reason to know that the information was "acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." Minn. Stat. § 325C.01, subd. 3; Electro- Craft, 332 N.W.2d at 903. Under Minn. Stat. § 325C.01, subd. 2, "[i]mproper means" includes theft, as well as the "breach of a duty to maintain secrecy."

While the First Amended Complaint does not allege that the information was obtained by theft or bribery, it does allege that Defendant Deltec is attempting to develop/use and exploit Plaintiff's information for its own benefit, without her consent and with the knowledge that the information was acquired per the Confidential Disclosure Forms which gave rise to a duty to maintain its secrecy or limit its use. These allegations sufficiently plead the claim of misappropriation because, if true, once Defendant Deltec sought to develop Plaintiff's information for its own benefit, it violated its duty to maintain secrecy.

Furthermore, insofar as the motion seeks to dismiss Count IV against the individually named Defendants because it fails to plead even one fact regarding their involvement in the alleged misappropriation, we disagree. The First Amended Complaint clearly alleges that Mr. Pope and Ms. Potasnak participated in the misappropriation by refusing to return Plaintiff's confidential information, despite her repeated requests. Assuming that all of the Plaintiff's allegations in the First Amended Complaint are true, this Court believes that she has sufficiently pleaded facts supporting her claim that Defendants Potasnak and Pope were involved in the alleged misappropriation.

Thus, in viewing the evidence in the light most favorable to Plaintiff, this Court is of the opinion that the First Amended Complaint sufficiently alleges the existence of a trade secret and pleads facts sufficient to establish a claim for misappropriation of a trade secret by Defendants Deltec, Potasnak and Pope. As such, Plaintiff has not failed to state a claim upon which relief can be granted and this Court will recommend that Defendants' Motion to Dismiss Count IV of the Complaint be denied.

**C. Defendants' Motion to Dismiss Count VI (Tortious Interference with Contract)**

Defendants seek dismissal of Count VI alleging tortious interference with contract because the individually named Defendants' actions are protected by the qualified privilege enabling an employee, in furtherance of the company's business, to interfere with another employee's employment contract.

A corporate officer or agent is privileged to interfere with or cause a breach of another employee's employment contract with the company, if that person acts in good faith believing that his or her actions are in furtherance of the company's business. See Nordling v. Northern States Power Co., 478 N.W.2d 498, 506 (Minn.1991); Cooper v. Gustavus Adolphus College, 957 F. Supp. 191 (D. Minn. 1997). This privilege may be lost if the defendant's actions are predominantly motivated by malice and bad faith, that is, by personal ill-will, spite, hostility, or a deliberate intent to harm the plaintiff. Id.

Assuming that all of the Plaintiff's allegations in the First Amended Complaint are true, this Court believes that Plaintiff has sufficiently pleaded facts that would preclude dismissal on the grounds of qualified privilege. Specifically, the First Amended Complaint alleges that Defendants Potasnak and Pope were motivated by racial and gender based stereotyping and maliciously

interfered with her contract. Without expressing any opinion about the success of this claim, this Court believes that at this stage in the litigation, Defendants cannot obtain dismissal of Count VI on the grounds of qualified privilege, and as such, this Court will recommend that Defendants' Motion be denied.

**D. Defendants' Motion to Dismiss Count VII (Defamation)**

Defendants seek dismissal of Count VII alleging defamation because: (1) the claim does not identify a single individual or any specific defamatory remarks made either orally or in writing; and (2) assuming *arguendo*, Defendants' statements about Plaintiff's discharge are protected by a qualified privilege because they were made in relation to her employment and job performance.

Under Minnesota law, the elements of a claim for defamation "require the plaintiff to prove that a statement was false, that it was communicated to someone besides the plaintiff, and that it tended to harm the plaintiff's reputation." Richie v. Paramount Pictures Corp. 544 N.W.2d 21, 25 (Minn. 1996). In addition, a claim for defamation must be pled with a certain degree of specificity, identifying who made the defamatory statements and what was said. See French v. Eagle Nursing Home, Inc., 973 F. Supp. 870, 883-884 (D. Minn. 1997). Statements made by supervisors concerning the reasons for an employee's termination are subject to a qualified privilege. See Lewis v. Equitable Life Assurance Society, 389 N.W.2d 876, 890 (Minn. 1986). However, to enjoy the privilege, a communication must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause. See Stuempges v. Parke, Davis Co., 297 N.W.2d 252, 255 (Minn. 1980) (also noting that actual malice will overcome the privilege).

As to the who and what, the First Amended Complaint alleges that Mr. Pope's January 24, 2001, and April 5, 2001, memorandum to Plaintiff, coupled with Ms. Potasnak's April 6, 2001,

Performance Improvement Plan and April 12, 2001, Memorandum and letter to Plaintiff relating to her alleged performance deficiencies provide the basis for her defamation claim. As to the qualified privilege, the First Amended Complaint specifically indicates that Defendants Potasnak and Pope acted with malice. Given the foregoing and the fact that this Court must afford Plaintiff the benefit of all reasonable inferences in deciding a motion to dismiss, this Court believes that Plaintiff has sufficiently stated her claim and that Defendants cannot obtain dismissal of Count VII on the grounds of qualified privilege. Consequently, the Court will recommend that Defendants' motion be denied.

## IV. RECOMMENDATION

Based upon the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendants' Motion to Dismiss Counts I and II (Race and Sex Discrimination in Violation of Title VII and MHRA) of the Complaint against the individually named Defendants be **GRANTED**;

2. Defendants' Motion to Dismiss Count IV (Misappropriation of Trade Secrets) of the Complaint be **GRANTED in part** and **DENIED in part** as follows:

   a. Insofar as the Motion seeks to Dismiss Count IV as it pertains to Defendants Deltec, Potasnak and Pope, it should be **DENIED**;

   b. Insofar as the Motion seeks to Dismiss Count IV as it pertains to Defendant Ms. Reichow, it should be **GRANTED**;

3. Defendants' Motion to Dismiss Count VI (Tortious Interference with Contract) of the Complaint be **DENIED**;

4. Defendants' Motion to Dismiss Count VII (Defamation) of the Complaint be **DENIED**.

DATED: June 6, 2002

FRANKLIN L. NOEL
UNITED STATES MAGISTRATE JUDGE

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, within ten days of this Report and Recommendation, written objections which specifically identify the portions of the proposed findings, recommendations or report to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this rule shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection in made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed within 10 days a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Circuit Court of Appeals.